## IN THE UNITED STATES DISTRICT COURT DISTRICT OF CONNECTICUT

| | |
|---|---|
| **Colleen Lord and Robert Francis Talbot, Jr., Co-Administrators of the Estate of Carl Talbot** | |
| **Plaintiffs** | **Case No.: 3:22-cv-00322 VLB** |
| **vs.** | |
| **Carlos Padro, Arden Coggins, Nicholas Belanger, Jeffrey Gibbons, Eddie Daniels, Nekengie Brookshire, Corron Petaway, Charles Washington, Malcolm Gatison, Patrick Davidson, Bii-Ron Wilkes, Jon Antoine, Margo Zukowska,** | |
| **Defendants** | |
| | **June 9, 2022** |

## REVISED COMPLAINT

## JURISDICTION

1. **Plaintiffs bring this civil action for monetary relief pursuant to 42 U.S.C. § 1983, the Eighth and Fourteenth Amendments to the U.S. Constitution, and Connecticut common law.**

2. **This Court has subject matter jurisdiction over these claims pursuant to 28 U.S.C. §§ 1331, 1343(a)(3) and (4). Plaintiff further invokes the supplemental jurisdiction of this Court under 28 U.S.C. § 1367(a) to hear and adjudicate state law claims.**

3. **This Court is the appropriate venue pursuant to 28 U.S.C. § 1391(b)(2) because the events and omissions giving rise to the claims occurred in the District of Connecticut.**

**PARTIES**

4.  Colleen Lord **and Robert Francis Talbot, Jr. are the co-administrators of the Estate of Carl Talbot, who was killed at New Haven Correctional Center (NHCC) after being subjected to excessive force by correctional officers who deployed an extraordinary and unjustifiable amount of pepper spray, placed Mr. Talbot in In-Cell Restraints and in doing do so subjected him to unreasonable and significant physical force that restricted his ability to breath, failed to remediate the effects of numerous, unnecessary and improper pepper spray blasts, left him unattended and unsupervised in an isolation cell, shackled on his back, wearing clothing contaminated with pepper spray and forced to breath air contaminated with pepper spray. The defendants denied him necessary, appropriate and required medical care, provided inadequate supervision as required, and left him alone, hogtied, in a state that eventually led to his death. They bring this action on behalf of the Estate of Carl Talbot and on behalf of all beneficiaries of the Estate.**

5.  **Defendant Carlos Padro was a Lieutenant and Supervisor employed at NHCC in March, 2019. At all times relevant to this Complaint, Defendant Carlos Padro was acting as an employee of the Connecticut Department of Corrections ("DOC") and was acting within the course and scope of his employment. He is sued in his individual capacity.**

6.  **Defendant Arden Coggins was a Lieutenant and Supervisor employed at NHCC in March, 2019. At all times relevant to this Complaint, Defendant Arden Coggins was acting as an employee of the Connecticut**

2

Department of Corrections and was acting within the course and scope of his employment. He is sued in his individual capacity.

7. **Defendant Nicholas Belanger was a Correctional Officer employed at NHCC in March, 2019. At all times relevant to this Complaint, Defendant Nicholas Belanger was acting as an employee of the Connecticut Department of Corrections and was acting within the course and scope of his employment. He is sued in his individual capacity.**

8. **Defendant Jeffrey Gibbons was a Correctional Officer employed at NHCC in March, 2019. At all times relevant to this Complaint, Defendant Jeffrey Gibbons was acting as an employee of the Connecticut Department of Corrections and was acting within the course and scope of his employment. He is sued in his individual capacity.**

9. **Defendant Eddie Daniels was a Correctional Officer employed at NHCC in March, 2019. At all times relevant to this Complaint, Defendant Eddie Daniels was acting as an employee of the Connecticut Department of Corrections and was acting within the course and scope of his employment. He is sued in his individual capacity.**

10. **Defendant Nekengie Brookshire was a Correctional Officer employed at NHCC in March, 2019. At all times relevant to this Complaint, Defendant Nekengie Brookshire was acting as an employee of the Connecticut Department of Corrections and was acting within the course and scope of her employment. She is sued in her individual capacity.**

11. **Defendant Corron Petaway was a Correctional Officer employed at NHCC in March, 2019. At all times relevant to this Complaint, Defendant**

Corron Petaway was acting as an employee of the Connecticut Department of Corrections and was acting within the course and scope of his employment. He is sued in his individual capacity.

12. Defendant Charles Washington was a Correctional Officer employed at NHCC in March, 2019. At all times relevant to this Complaint, Defendant Charles Washington was acting as an employee of the Connecticut Department of Corrections and was acting within the course and scope of his employment. He is sued in his individual capacity.

13. Defendant Malcolm Gatison was a Correctional Officer employed at NHCC in March, 2019. At all times relevant to this Complaint, Defendant Malcolm Gatison was acting as an employee of the Connecticut Department of Corrections and was acting within the course and scope of his employment. He is sued in his individual capacity.

14. Defendant Patrick Davidson was a Correctional Officer employed at NHCC in March, 2019. At all times relevant to this Complaint, Defendant Patrick Davidson was acting as an employee of the Connecticut Department of Corrections and was acting within the course and scope of his employment. He is sued in his individual capacity.

15. Defendant Bii-Ron Wilkes was a Correctional Officer employed at NHCC in March, 2019. At all times relevant to this Complaint, Defendant Bii-Ron Wilkes was acting as an employee of the Connecticut Department of Corrections and was acting within the course and scope of his employment. He is sued in his individual capacity.

16. Defendant John Antoine was a Correctional Officer employed at NHCC

4

in March, 2019. At all times relevant to this Complaint, Defendant John Antoine was acting as an employee of the Connecticut Department of Corrections and was acting within the course and scope of his employment. He is sued in his individual capacity.

17. Defendant Margo Zukowska was a Registered Nurse employed at NHCC in March, 2019. At all times relevant to this Complaint, Defendant Margo Zukowska was acting as an employee of the Connecticut Department of Corrections and was acting within the course and scope of her employment. She is sued in her individual capacity.

18. At all times, all defendants were acting under color of state law.

19. At all times, all defendants were acting in concert and conspiracy and are jointly and severally liable for the harms caused to the Estate of Carl Talbot.

**STATEMENT OF FACTS**

20. Carl Talbot (hereinafter referred to as "Robby Talbot" and/or "Mr. Talbot") was at the time of his death a 30-year-old male and this action is brought on behalf of his Estate by his mother, Colleen Lord, and his father, Robert Francis Talbot, Jr., Co-Administrators of the Estate of Carl Talbot. The Co-Administrators were appointed to that capacity by the Probate Court of West Haven, Connecticut on the 6th day of May, 2019.

21. As a pre-teenager, Mr. Talbot was diagnosed with Bi-Polar Disorder and other behavioral issues. In his teen years, Mr. Talbot began to use alcohol and illegal substances, for which he received counseling and

5

treatment to which he was compliant.

22. **As Mr. Talbot entered his 20's, his illegal drug use increased as did the extent of his mental health issues.  During this time period, Mr. Talbot lived with his mother and with friends in the New Haven area.  He was prescribed Methadone during this time period in order to address his outstanding drug issues and received regular counseling for his mental health and substance abuse needs.**

23. **In 2017, Mr. Talbot was arrested and charged with, *inter alia,* crimes such as larceny 6th degree, breach of peace 2nd degree, use/possession of drug paraphernalia, criminal mischief 4th degree violation of probation, and criminal mischief 4th degree, largely based upon his erratic behavior arising from his psychological condition and illegal use of drugs.**

24. **In 2018, Mr. Talbot was arrested again for*, inter alia,* trespass 1st degree, breach of peace 2nd degree, possession of controlled substances, criminal mischief 3rd degree, and violation of probation arising from behavior prompted by his psychological and substance abuse issues.**

25. **In May, 2017, June 2018, February 2018 and July 2018, Mr. Talbot was placed into the custody of the Connecticut Department of Corrections for short periods prior to being released on bail. As part of these brief incarcerations, Mr. Talbot was examined medically and his DOC medical records document his prior existing medical concerns.**

26. **On or about September 10, 2018, Mr. Talbot was sentenced to a 6-month sentence arising from a number of the charges listed above, and he was**

6

incarcerated at the NHCC from September 10, 2018 until January 24, 2019, when he was released on parole.

27. **At various times subsequent to his incarcerations with the DOC listed above, Mr. Talbot was seen by medical personnel on behalf of the DOC. During his incarcerations, DOC personnel became familiar with his medical history and DOC medical staff diagnosed Mr. Talbot as suffering from obesity hyperventilation syndrome, obstructive sleep apnea, asthma and obesity.**

28. **Obesity hyperventilation syndrome (OHS) is a breathing disorder seen in some people who are obese that leads to low oxygen levels and too much carbon dioxide in their blood. Low oxygen and high carbon dioxide levels may develop because of a condition called hypoventilation which means not enough air moves in and out of the lungs. OHS also may result in difficulty sleeping because of obstructive sleep apnea.**

29. **Obstructive sleep apnea is a sleep-related respiratory disorder characterized by airway blockages caused by throat muscles when a person sleeps.**

30. **Asthma is a respiratory condition in which a person's airways narrow and swell and may produce extra mucus, making it difficult to breath.**

31. **Obesity is a complex disease involving an excessive amount of body fat. Obesity increases the risk of other diseases and health problems,**

such as heart disease, diabetes, high blood pressure and certain cancers.

32. **During the time Mr. Talbot was incarcerated by the DOC at NHCC, his medical records indicate that he received prescriptions for the treatment of his asthma, including Ventolin (Albuterol Sulfate), inhalers, and a BiPAP (also referred to in DOC medical records as a CPAP) machine to assist in preventing disruptions inbreathing caused by obstructive sleep apnea.**

33. **Defendant Zukowska is a registered nurse and was Mr. Talbot's medical care provider for the time period of September, 2018 through January, 2019, and again upon his readmission to the NHCC on March 19, 2019 through March 20, 2019.**

34. **Defendant Zukowska was fully aware that Mr. Talbot suffered from the medical conditions identified above, and was personally aware that he relied upon a BiPAP machine to assist him in breathing during the time that he was in the care and custody of the DOC from September, 2018 through January, 2019 at the NHCC.**

35. **On March 19, 2019, at approximately 8:45 p.m., Mr. Talbot was re-arrested by the New Haven Police Department for violation of the conditions of his parole, specifically that he was no longer staying with his mother at her residence but instead was planning to spend several evenings with his father at a local hotel.**

36. **When Mr. Talbot was arrested by New Haven Police on March 19, 2019, he was transported to the NHCC.**

37. **On March 19, 2019, Mr. Talbot was placed in the custody of the DOC at the NHCC.  At the time of his reincarceration at the NHCC, Mr. Talbot had been receiving a regular prescription of Methadone in order to deal with his addiction issues, and still suffered from significant mental illness.**

38. **Upon learning of Mr. Talbot's reincarceration, plaintiff, Colleen Lord, contacted the NHCC at approximately 2:00 p.m. on March 20, 2019 and indicated that Mr. Talbot would be undergoing withdrawal symptoms if he did not receive his regular Methadone prescription, and further advised the nursing staff that Mr. Talbot was in need of his BiPAP machine. Ms. Lord traveled to the prison between 2:00 p.m. and 3:00 p.m. on March 20, 2019 and dropped off Mr. Talbot's BiPAP machine to the medical personnel at NHCC.**

39. **Upon his admission, a DOC physician indicated that based upon a face-to-face interview with Mr. Talbot, he was "actively detoxing from substances" and had "serious mental illness."**

40. **Upon his readmission, the medical staff at the NHCC, particularly Defendant Zukowska, were aware of Mr. Talbot's mental health and substance abuse issues, in addition to his asthma, obstructive sleep apnea, obesity hyperventilation syndrome and obesity.  On prior occasions, the medical staff at NHCC, in particular Defendant Zukowska,**

9

were aware that upon admission, Mr. Talbot would be suffering from the effects of detox and was prone to act out in a non-violent manner while undergoing detox.

41. **On the afternoon of March 20, 2019, while waiting to receive a medical check-up to evaluate the extent of his detox condition, Mr. Talbot made inappropriate remarks to a staff nurse and lowered his pants in the presence of staff.  As a disciplinary measure, Mr. Talbot was removed from the Medical Unit and placed in the Restricted Housing Unit (RHU). At this time, Mr. Talbot was placed in handcuffs and escorted to the Restricted Housing Unit where he was placed in solitary confinement.**

42. **Later that day, while in the RHU, Mr. Talbot's erratic behavior was observed by a lieutenant and he was transferred from the RHU back to the Medical Unit on the basis that he was suffering from mental health concerns and/or physical detox concerns that required his reassignment to the Medical Unit pending a mental health review by a physician.  The lieutenant placed Mr. Talbot on a "Custody Hold" in the Medical Unit until such time as he could be cleared by a physician for return to the general prison population subsequent to a mental health examination.**

43. **At approximately 6:30 a.m. on March 21, 2019, Mr. Talbot was awakened for breakfast.  He repeatedly expressed his desire to make a telephone call, and when such request was refused, Mr. Talbot began to act irrationally and smear feces on the inside window of his cell.**

10

44.  **The defendants, in particular Defendant Zukowska, recognized that this was not normal behavior for Mr. Talbot.  Despite being familiar with Mr. Talbot's history of mental illness and withdrawal issues after being reincarcerated, Defendant Zukowska did not seek to obtain any medical assistance for him, but instead called for correctional officers to address Mr. Talbot's conduct.**

45. **At approximately 6:45 a.m., Defendants Brookshire, Padro, and Coggins reported to the Medical Unit to address the situation with Mr. Talbot.  At that time, after efforts to communicate with Mr. Talbot were undertaken, Mr. Talbot agreed to remove himself from his cell and proceeded to a shower located within the Medical Unit to clean himself.**

46. **While in the shower, Mr. Talbot laid on the floor, and despite the request from Defendants Padro, Coggins and/or Brookshire to leave the shower unit, Mr. Talbot remained on his back and refused to leave the shower unit.**

47. **This uncharacteristic behavior was known to the defendants, and in particular Defendant Zukowska, to be the effect of Mr. Talbot's mental illness as well as his state of detoxification upon being incarcerated and not receiving his regular prescription of Methadone.**

48. **Despite this behavior being obviously the result of Mr. Talbot's mental illness and the physical effects of his detoxification, no physician or other medical provider was summoned in order to evaluate Mr. Talbot's physical and/or mental state or to provide him any treatment for the**

11

effects of his mental breakdown and/or the physical effects of his detoxification.

49. **According to a use of force report filed by Defendant Brookshire, at approximately 6:45 a.m., Defendant Brookshire ". . . deployed chemical agent towards his [Mr. Talbot's] facial area in an attempt to gain his compliance."**

50. **Oleoresin Capsicum spray (OC spray, colloquially known as pepper spray), is an inflammatory agent that affects the mucous membranes in the eyes, nose, throat, and lungs. It results in severe physical symptoms, including a painful burning sensation of the lungs and associated shortness of breath, and temporary blindness.**

51. **OC spray can have serious, long-lasting effects, including the risk of death, on people with underlying respiratory illnesses and conditions.**

52. **OC spray poses a particularly high risk of serious injury or death when deployed on people with respiratory conditions when they are subjected to significant volume or prolonged exposure to the chemical agent.**

53. **Correctional Officers who utilize OC spray are required to have been trained in the use of OC spray. Consistent with the training, they were or should have been aware that when using OC spray, they were permitted to only use one or two quick bursts, lasting from half a second to one second. They were likewise aware that any different usage—including prolonged spraying—was not permitted as such usage poses a substantial danger to the person subjected to the spray.**

54. **DOC correctional officers, including these defendants, were required to**

be trained in regard to the heightened risk that individuals with respiratory conditions face when subjected to a serious respiratory irritant like OC spray.

55. The OC spray utilized by Defendant Padro carries the brand name "SABRE RED" and it is manufactured by the SABRE Company. SABRE RED is the hottest and most potent OC available to law enforcement and has a 'major capsaicinoids' (MC) of 1.33% and has an Oleoresin Capsium (OC) percentage of 10%, making it a "Level III" (the highest) potency of OC spray. The delivery system utilized in Defendant Padro's OC spray is designed to propel the OC in a concentrated and direct stream and is extremely effective in projecting a fine mist of the OC into the recipient's eyes, respiratory system and in the surrounding air as well as on the recipient's clothing.

56. Pursuant to the Connecticut Department of Corrections Policy entitled "Authorized Armory Items During Use of Force" Attachment A, Administrative Directive No. 6.5.6, chemical agents may only be used under the following circumstances:

**6. Chemical Agents**

    a.    **General Provisions**

    i.    **Chemical agents may be utilized when there is a:**

        **1. threat posed by the inmate (e.g., active aggression, presence of weapons, known history of assaultive behavior, inmate's non-compliance with lawful orders, etc.)**

        **2. potential injury to staff and/or inmate; and/or**

13

3. continuing refusal by an inmate to comply with a direct order.

    ii.    **When it is determined that chemical agent is necessary during a planned use of force, the following elements must be considered and assessed prior to the use:**

    **1. The area where agent shall be employed;**

    **2. The potential exposure or impact on uninvolved persons; and/or**

    **3. The presence of a known physical condition, medical or mental concern, known to staff utilizing the chemical agent which contraindicate use, (e.g., heart or respiratory condition, irregular breathing, etc.).**

57. **Pursuant to the Connecticut Department of Corrections Policy entitled "Authorized Armory Items During Use of Force" Attachment A, Administrative Directive No. 6.5.6, prior to the use of chemical agents DOC personnel are required to make a determination that the use of OC spray is not contraindicated by the inmate's medical condition, as indicated in the inmate's health record:**

    c.    <u>**Contraindication of the Use of Chemical Agent:**</u>

    ii.    **Prior to a planned use of physical force employing chemical agents and absent exigent circumstances, the inmate's health record shall be reviewed by a qualified health services staff member to determine whether the use of chemical agents on the inmate is medically contraindicated.**

    **1. The outcome of this consultation shall be documented on a medical incident report and in the inmate's health record.**

    iii.    **If the use of chemical agents is medically contraindicated, but there are exigent circumstances that require the use of a chemical agent, the custodial supervisor shall speak with medical staff regarding what the contradictions are and how they can be treated if chemical agent is utilized to protect the safety and security of the inmate(s) and staff.**

    iv.    **The custodial supervisor shall then communicate with the Unit Administrator or designee to determine if chemical agent may be utilized despite being medically contradicted.**

**1. If the Unit Administrator or designee approved the ability for chemical agent to be utilized despite being medically contraindicated, then the custodial supervisor and medical staff shall ensure that there is medical care in the direct area to administer appropriate medical interventions after exposure to chemical agent.**

58. **The use of Oleoresin Capsicum Spray/OC spray/pepper spray is a use of force pursuant to the State of Connecticut, Department of Corrections, Administrative Directive #6.5, "Use of Force."**

59. **The State of Connecticut, Department of Corrections, Administrative Directive #6.5, Use of Force, Subsection 5(b) states that any planned use of physical force requires that the supervisor shall summon a video camera to document the verbal intervention as well as the planned use of physical force Administrative Directive #6.5(b) specifically states the following:**

**<u>Use of Physical Force:</u>**

**(b) Prior to a planned use of physical force, a correctional supervisor shall summon a video camera which shall document the verbal intervention as well as the planned use of physical force in accordance with Section 11 of this Directive.**

**i. When verbal intervention is unsuccessful, the correctional supervisor and a health services staff member shall confer and gather pertinent information about the inmate's health status and any immediate concerns.**

**(c) When there is no immediate threat to staff, the inmate, others or the order or the safety and security of the facility, and the inmate is secure, voluntary cooperation, control and compliance shall be attempted by verbal intervention by available health services, custody or other Department staff.**

**i. Whenever practical, treatment staff (i.e., mental health,**

15

**medical, or counseling staff) shall be utilized prior to a planned use of physical force.**

**ii. This attempt shall be documented in the supervisor's report.**

**(d) A correctional supervisor shall issue a last verbal warning to the inmate and advise the inmate that force shall be used to include, but not limited to chemical agents and/or canine, and provide the inmate with a reasonable amount of time to comply with lawful direction before initiating the use of physical force.**

**i. In the event such measures are unsuccessful, reasonable physical force may be utilized.  Prior to the planned use of physical force, the supervisor shall designate the appropriate staff to apply such force in accordance with this Directive.**

60. **At no time is the reported use of OC Spray by Defendant Brookshire, as described in her Use of Force Report, and as reviewed by Defendant Coggins, preserved on any video tape as required by the DOC Policies identified above.**

61. **At no time does any report indicate that Defendant Brookshire, Defendant Coggins or any other defendant issued verbal warnings to Mr. Talbot that he was going to be exposed to OC spray prior to the reported discharge of OC spray by Defendant Brookshire.**

62. **At no time did any defendant, particularly Defendant Zukowska, prior to the planned use of force by Defendants Brookshire or Padro – specifically the deployment of OC spray against Mr. Talbot - review his corrections department health record to determine whether the use of chemical agent by Defendants Brookshire or Padro on Mr. Talbot was medically contraindicated.**

63. **The use of Oleoresin Capsicum Spray/OS spray/pepper spray was**

16

medically contraindicated based on Mr. Talbot's history of respiratory issues, including asthma, obstructive sleep apnea, obesity hyperventilation syndrome and obesity, in addition to his mental illness and obvious withdrawal from opiates, all of which conditions were known, or should have been known, and were readily knowable, to all defendants.

64. Defendants were required to obtain appropriate training and certification, as correctional officers, including Defendants Padro and Coggins, pertaining to the safe and appropriate use of OC spray consistent with DOC Administrative regulations and with the recommended uses of OC as established by the manufacturer SABRE.

65. Defendant correctional officers working at the NHCC were required to follow established DOC regulations regarding the use of force, in particular the use of OC spray, and have a duty to ensure that correctional officers comply with all applicable DOC administrative regulations and act in a manner consistent with their training in the use of OC spray, including the adherence to manufacturer's standards regarding the safe utilization of OC spray. This responsibility includes the imposition of appropriate discipline upon correctional staff who fail to follow DOC administrative regulations and act in a manner consistent with their training in the use of OC spray.

66. Defendants Padro and Coggins, in addition to the other defendant

correctional officers, were required to be trained and certified in the appropriate use of OC spray pursuant to DOC Administrative Regulation 6.5.6(a) (iii)(1).

67. The training in order to certify the defendant correctional officers to use OC spray included providing those defendant officers and medical staff such as Defendant Zukowska the instructional materials from SABRE - the manufacturer of the SABRE RED OC spray utilized by the defendants to ensure that the defendant correctional officers and medical staff complied with the manufacturer's instructional materials regarding the safe and appropriate use of SABRE RED.

68. The SABRE RED OC spray cannister utilized by Defendant Padro in this incident contained specific warnings and instructions for safe usage as established by the manufacturer. Defendants Padro and Coggins were aware, or should have been aware, of these warnings pursuant to the training they received.

69. In addition to the specific warnings contained on the SABRE RED cannister utilized by Defendant Padro in this incident, Defendants Padro, Coggins, Zukowska and some or all of the other defendant correctional officers involved in this incident received training based on the manufacturer's warnings and instructions for safe usage regarding the use of SABRE RED OC spray.

70. The training provided to Defendants Padro, Coggins, Zukowska and some or all of the other defendant correctional officers included the

following specific instructions and warnings from the manufacturer of

SABRE RED:

<u>WARNING</u>

**TRAINING REQUIRED BEFORE USE!**

**INSTRUCTIONS:  Law Enforcement and Corrections use only.**

**Spray Pattern/Delivery System Instructions:  Reduce injuries by following the deployment instructions on your canister label (see below) and the instructions located for your specific spray pattern/delivery system**

**Cone Instructions:**

**Spray ½ to 1 second bursts.  Move the spray up and down over the center of the subject's face.  Repeat this process until you have contacted the target acquisition area.**

**\*Causes serious eye irritation, skin irritation and respiratory irritation.**

**FIRST AID:  After restraining subject, move to fresh air away from contaminated area and verbally reassure subject.  IMMEDIATELY request medical attention if subject has preexisting medical conditions or other medical issues.   If appropriate, remove contaminated clothing. IF ON SKIN: Wash with plenty of soap and water.  IF IN EYES:  Rinse cautiously with water for several minutes.**

71. Defendants Padro, Coggins, Zukowska and some or all of the other

defendant correctional officers were or should have been trained

regarding these warnings and instructions from the manufacturer for

the safe use of SABRE RED OC spray:

**WARNING:  DO NOT use until you read the following instructions**

**INSTRUCTIONS:   To be used by Law Enforcement, Corrections, Military or Security Personnel trained in the proper use of SABRE aerosol projectors.  Reduce injuries by following these instructions.**

**Spray Patter / Delivery System Instructions:  Reduce injuries by following the deployment instructions on your canister label (see below) and the instructions located for your specific spray pattern / delivery system.**

**Cone Instructions:   Aim actuator towards the center of the subject's face.  Press actuator to deploy in ½ to 1-second bursts.**

> **WARNING:  DO NOT discharge at a distance of less than three feet – may cause injuries to soft body tissue.  If you are unable to restrain the subject after 3, ½ to 1 second bursts, employ next appropriate force option.**
>
> **FIRST AID:  Begin decontamination process as soon as possible after restraining subject.  Remove subject from contaminated area to area of fresh air.   Get Medical Attention immediately if subject has any preexisting medical conditions or other medical issues.   Verbally reassure subject.  If appropriate, remove contaminated clothing.  If available, rinse affected area with clean, cool running water and soap.   Repeat if necessary. Periodically monitor subject until they are fully recovered.  Get medical attention if symptoms persist.**

72. **Defendants Padro, Coggins, Zukowska and some or all of the other defendant correctional officers were or should have been trained regarding these warnings and instructions from the manufacturer for the safe deployment of SABRE RED OC spray:**

> **Deployment Guidelines**
>
> **WARNING**
>
> **ALWAYS read and follow SABRE Aerosol Irritant  Projectors Instructions for proper contamination guidelines. To prevent SERIOUS INJURY or DEATH:**
>
> **· DO NOT contaminate subject with the maximum number of bursts allowed if the subject stops resisting and/or you are able to control and restrain the subject using fewer than the maximum number of deployments permitted.**
>
> **· DO NOT deploy in confined areas that could cause contamination of innocent parties. . . Do not deploy into a crowded,**

20

confined area.

· **DO NOT deploy on…on any individual with obvious signs of a medical condition.**

· **DO NOT deploy on those with a known preexisting medical condition or other medical issues unless grievous bodily harm or death is very likely to occur in either the officer or the subject.**

- **DO NOT leave subjects in their contaminated cell or a confined space after an Aerosol Irritant Projector has been deployed.**

· **DO NOT use Neck Restraints, Chock Holds, Carotid Holds on subjects after they have been contaminated by a SABRE® Aerosol Irritant Projector.**

· **DO NOT limit their ability to breathe in any way after they have been contaminated by a SABRE® Aerosol Irritant Projector.**

**WARNING**

**Physiological Symptoms of OC Exposure**

| | | |
|---|---|---|
| Tingling skin | Gasping | Eye swelling |
| Burning skin | Gagging | Eye Burning |
| Skin redness | Inability to speak | Eye inflammation |
| Skin swelling | Laryngospasm | Tearing eyes |
| Burning throat | Sneezing | Blepharospasm |
| Dry cough | Nasal irritation | Restrictionof Vision |
| Wheezing | Runny nose | Headache |
| Restriction of deep lung breath | Increased blood pressure | Eye redness |

**Physiological Symptoms of CS Exposure**

**Eyes:  excessive tearing, burning, blurred vision, redness**

**Nose:  runny nose, burning, swelling**

**Mouth:  burning, irritation, difficulty swallowing, drooling**

**Lungs:   chest tightness, coughing, choking sensation, noisy breathing (wheezing), shortness of breath**

**Skin:  burns, rash**

**Other:  nausea and vomiting**

21

**Psychological Symptoms of OC or CS Exposure**

**Inward focus on pain**          **Panic**

**Sense of helplessness**

**Anxiety**                        **Anger**                        **Fear**

73. **Defendants Padro, Coggins, Zukowska and some or all of the other defendant**

   **correctional officers were or should have been trained regarding these**

   **warnings and instructions from the manufacturer for the safe "Care and**

   **Decontamination" of individuals subjected to a deployment of SABRE RED OC**

   **spray:**

   **The following is a summary from your SABRE® training.  Please be sure
   to periodically review and follow these complete materials during
   subject care and decontamination.**

   **After the subject has been physically restrained, the first step in
   decontamination is to remove them from the contaminated area.  The
   operators must take steps to minimize the risk factors associated with
   death proximal to restraint.  The following factors can contribute to the
   totality of the risk of death proximal to restraint*:  *These risk factors
   apply regardless if the subject matter is restrained or not.**

   **WARNING:  To prevent SERIOUS INJURY or DEATH:**

   **Position Asphyxia - DO NOT hogtie subjects.  Once the subject is
   restrained, officers should ensure that they immediately remove any
   pressure off the back of the resisting individual and place them in an
   upright, seated position.  DO NOT limit their ability to breath in any way
   and monitor them to prevent positional asphyxia.**

   **Preexisting Medical Conditions – Question and observe the subject for
   any medical concerns.**

   **IMMEDIATELY request EMS following any SABRE® Contamination if a
   subject is known to have or if the subject can confirm if they have any of
   the following preexisting medical conditions:**

   **· Eye Disorders;                                · Lung Problems;**

22

· **Heart Problems**                          · **Diabetes;**

· **Respiratory Problems**               · **High Blood Pressure; or**

· **Other Medical Issues**

**DO NOT contaminate a subject known to have any of the above preexisting medical conditions unless necessary to protect the officer or subject. IMMEDIATELY request EMS.**

**WARNING**

**IMMEDIATELY request EMS to prevent SERIOUS INJURY or DEATH. If subject has signed or symptoms, or has asthma, or any combination of the above.**

**Cocaine and Other Illicit Stimulant Toxicity – IMMEDIATELY request EMS if a subject indicates they have ingested cocaine or if other illicit stimulant toxicity is suspected.**

**Asthma – There are several triggers that may occur during an encounter that does not involve the use of an aerosol irritant projector. Physical exertion and/or acute stress can trigger asthma attacks.**

**IMMEDIATELY request EMS if the subject indicates they are asthmatic. DO NOT contaminate subjects known to have asthma unless necessary to protect the officer or subject.**

**If the subject has access to an inhaler, ventilator, or other prescribed medication allow the subject to utilize their medication.**

**SUBJECT DECONTAMINATION**

**After the subject has been physical restrained, the first step in decontamination is to remove them from the contaminated area. The officer must also question and observe the subject for any medical concerns. (See above-detailed section on preexisting medical conditions).**

**Once the subject is in a safe environment, decontamination can begin.**

**Subject Decontamination Steps**

  **1. Reassure Subject – Reassure the subject that the effects are temporary and that you will assist in providing relief.**

  **2. Remove Any Contaminated Clothing – If appropriate, remove any contaminated clothing and seal in a plastic bag.**

  **3. Clean Skin with Wet Cloth – Any clean cloth can be soaked in cool clean water and used to wipe any visible product from the subject's skin.**

4**. Provide Copious Amounts of Cool Clean Water for the Eyes and Skin – If  available, utilize a hose with cool clean water ensuring there is not too much pressure.  A garden hose held upright to the sky until 1 ½ inches of water deploys will create the proper water pressure for decontamination.  The hose should be held over the bridge of the nose aiming horizontally over one eye towards the outside of the face so as not to re-contaminate the other eye.**

**All subjects who have been contaminated by an aerosol irritant projector should be constantly monitored while in custody.  The subject should begin to feel significant relief within in 20 to 30 minutes.  If they experience any abnormal symptoms or any other medical issue contact EMS immediately.   Most effects will have completely subsided within one hour.  IF SYMPTOMS PERSIST, get medical advice/attention.**

**If the subject is incarcerated, ensure that the staff is made aware that the subject was contaminated with an aerosol irritant projector.**

74. **A Department of Corrections' hand-held video was summoned at approximately 7:05 a.m., and at the 00.07 mark on the video, Defendant Padro, standing over Mr. Talbot's body lying on the ground, sprays Mr. Talbot directly in the face for approximately two to three seconds from a distance of less than several inches from Mr. Talbot's eyes.  Defendant Padro then intentionally and forcibly kicks Mr. Talbot in the head and/or upper body area with his boot while Mr. Talbot is effectively blinded by the OC spray and is defenseless, laying on his back in the confined space of the shower stall. Defendant Padro thereafter applies OC spray again into Mr. Talbot's eyes and face from a distance of several inches a second time. At the time Mr. Talbot received this second application of OC spray from Defendant Padro, he is already effectively blinded from the first application, and he remains completely and utterly defenseless to this use of force.**

75.  **Prior to applying force to Mr. Talbot through two lengthy sprays of OC Pepper Spray and a forceful kick, Defendant Padro is not recorded providing any warning to Mr. Talbot that either the application of OC spray directly to his eyes and face or a forceful kick to his head/upper body would be forthcoming from Defendant Padro.**

76. **At no time prior to the application of OC spray to Mr. Talbot by Defendant Padro did any defendant, in particular Defendant Padro and Defendant Zukowska, review Mr. Talbot's health record to determine whether the use of chemical agents on Mr. Talbot was medically contraindicated, as required by the State of Connecticut, Department of Corrections Authorized Armory Items During Use of Force Policy, 6.5.6(c)(ii) as cited above.**

77. **The application of OC spray by Defendant Padro was witnessed by Defendant, Zukowska, who (1) had actual or constructive knowledge or (2) would have, upon conducting a review of Mr. Talbot's medical file as required by DOC regulations prior to the application of OC spray, obtained actual and/or constructive knowledge of the presence of medical conditions suffered by Mr. Talbot that medically contraindicated the use of OC spray upon Mr. Talbot, specifically his medical history documented within the DOC medical records of respiratory conditions, mental illness, and opiate withdrawal, including, but not limited to, obstructive sleep apnea, asthma, and obesity hypoventilation syndrome.**

78. **The use of physical force utilized by Defendant Padro at this time was used for the harassment or punishment of Mr. Talbot and for no other authorized permissible use pursuant to DOC Regulations. These improper uses of force were witnessed by Defendants Daniels, Gibbons, Belanger, Coggins and Zukowska, who did nothing to intervene to assist Mr. Talbot or prevent these repeated uses of force upon him.**

79. **At the time of the incident in the shower, and prior to the applications of OC spray by Defendant Brookshire and/or Defendant Padro, Mr. Talbot was not a threat to any DOC personnel or to himself, and his misbehavior was known, or should have been known to the defendants to be the result of his mental illness and/or his physical condition based upon the known condition of his detoxification.**

80. **After Mr. Talbot removes himself from the shower subsequent to his repeated exposure to OC spray, and after being forcibly kicked in the head and/or upper body by Defendant Padro, Mr. Talbot is seen bloodied, dazed, and confused, with his eyes burning from the application of OC spray and coughing from the obvious effects of the spray on his respiratory system.**

81. **Mr. Talbot was provided with a superficial decontamination of his eyes by Defendant, Zukowska, put into handcuffs, provided with a new orange jumpsuit, and was placed into a wheelchair.**

82. **Despite Mr. Talbot being placed in the Medical Unit on a "Custody Hold" by the lieutenant from the prior shift pending a mental health review by a physician, Defendant Padro ordered that Mr. Talbot be returned to the**

26

RHU, prior to Mr. Talbot receiving the mental health analysis for which he had been returned to the Medical Unit as a "Custody Hold."

83. After receiving the superficial decontamination of his eyes by Defendant Zukowska, and as Mr. Talbot is wheeled towards the RHU, he repeatedly coughs and remarks "it hurts so much," "my skin hurts," "I'm scared, it's burning," "OK my skin hurts a lot though," "Help," and other statements that clearly placed Defendants Padro, Belanger, Daniels, Coggins, Gibbons and Zukowska on notice that Mr. Talbot was still suffering from the effects of OC spray on his breathing, his vision and his skin.

84. Defendants Belanger, Daniels, Coggins and Gibbons, participated in the handcuffing and removal by wheelchair of Mr. Talbot from the Medical Unit towards the RHU.

85. These defendants knew pursuant to their training, that the applications of OC spray by Defendant Brookshire and/or Defendant Padro, were contrary to established DOC policies in that they took place without a verbal warning and without obtaining prior medical clearance establishing the absence of any medical contraindications. In addition, the force utilized by Defendant Padro through his kick into the head and/or upper body of Mr. Talbot while he lay blinded by OC spray on the floor of the shower should also have been known to the defendants to be improper and contrary to the DOC policies cited above, amongst others.

86. Despite this, neither Defendants Belanger, Daniels, Gibbons or Coggins,

27

or Defendant Zukowska said or did anything to protect Mr. Talbot and/or require Defendant Padro or any other officer to comply with known applicable regulations of the DOC.

87. While expressing the extent of his physical pain due to the application of OC spray, and showing the obvious effects of his mental health breakdown and physical issues related to his likely detoxification, Mr. Talbot becomes more anxious as the defendants wheel him towards the elevator to return him to the Restricted Housing Unit.  While approaching the elevator door, Mr. Talbot tenses his body in an effort to prevent his entry into the elevator.

88. At the 7:01-7:03 mark on the DOC handheld videotape (approximately 7:12 a.m.) without warning and contrary to the DOC Regulations previously cited above, Defendant Padro applies OC spray for the third time (the fourth if Defendant Brookshire's reported application of OC spray to Mr. Talbot is counted), directly to Mr. Talbot's face for a period of one to two seconds and from a distance of less than several inches. This application of OC sprays takes place in the closed environment of the elevator.

89. The application of OC spray directly to Mr. Talbot's eyes and face at this time was contrary to the specific regulations of the DOC governing the use of OC spray and was used for the harassment and/or punishment of Mr. Talbot by Defendant Padro.

90. After riding the elevator up to the "Fox Trot" wing of the correctional facility where the RHU is located, Mr. Talbot is seen on the Department

28

of Corrections tape leaving the elevator escorted by Defendants Gibbons, Daniels and Padro.

91. **At this point in time, Mr. Talbot is once again effectively blinded by the third application of OC spray by Defendant Padro, and although he is obviously exhibiting physical, mental and psychological upset and discomfort from this third application of OC spray directly into his face and eyes, Mr. Talbot is cooperative and non-confrontational with the defendants as he enters and remains in the RHU cell.**

92. **After entering the cell, Mr. Talbot is in obvious and increasing distress, and mentions repeatedly to Defendant Padro and Defendants Daniels, Belanger, Coggins and Gibbons, that he "needs to go to the bathroom right now" and he cries out "I'm on fire."  Defendant Padro's response is to order that the water in the cell unit be turned off.**

93. **At the 8:31 mark on the DOC handheld videotape (approximately 7:13 a.m.), Mr. Talbot is escorted into the Fox Trot cell and seated on the bed in the cell with Defendants Daniels and Gibbons holding him down by both arms. He is observed on the videotape attempting to deal with the obvious pain and discomfort from having been sprayed for the third time with OC spray by Defendant Padro in the elevator. He is offering no physical resistance that would put any correction officer in danger or in any way place himself in danger, and asks again "Can I go to the bathroom" and responds "OK" to Defendant Padro's request to "Calm down."**

94. **At the 9:22 mark on the DOC handheld videotape (approximately 7:15**

29

a.m.), just after being in the cell for 35 seconds, Defendant Padro applies a fourth blast of OC spray directly into the eyes of Mr. Talbot from a distance of several inches. No warning is provided to Mr. Talbot by Defendant Padro that he is going to be subjected to another application of OC spray. The use of OC spray at this time by Defendant Padro was for the harassment and/or punishment of Mr. Talbot by Defendant Padro, and served no valid administrative purpose.

95. These improper uses of force in the elevator and the cell were witnessed by Defendants Daniels, Gibbons, Belanger, and Coggins, who did nothing to intervene to assist Mr. Talbot or prevent these repeated uses of force upon him.

96. The air in the cell in which Mr. Talbot was confined, as well as his clothing, was now saturated with OC spray.  At the DOC videotape mark 09:23, the effect of the OC spray in the confined space of the cell is visible when Defendant Daniels reacts to the effects of the OC spray despite being several feet away from Mr. Talbot's face when the OC spray is applied by Defendant Padro.

97. After Defendant Daniels was forced to leave the cell because of the significant amount of OC spray to which he was exposed and which remained in the air within the cell, he was replaced by Defendant Belanger, who entered the cell and along with Defendants Padro and Gibbons, surrounded Mr. Talbot. Mr. Talbot was now effectively and completely blinded by the two lengthy applications of OC spray, for which he had not received any decontamination from medical staff.

30

98. **For approximately two minutes between the 09:22 and 11:28 marks on the DOC handheld videotape (approximately 7:14 – 7:16 a.m.), Mr. Talbot is seen in his cell moving up and down from his bunk, rolling on the mattress, standing on the mattress towards the window, and sitting on the floor all while surrounded by Defendants Belanger, Padro, Gibbons and Coggins. Mr. Talbot is cooperative and follows the commands of the officers during this time period despite being effectively blinded and in significant physical pain and mental distress as a result of his treatment by the defendant corrections officers.**

99. **During the two minutes after he is sprayed the fourth time by Defendant Padro, Mr. Talbot is not a threat to any of the correctional officers in the cell. In fact, during those two minutes, none of the defendant officers have their hands on Mr. Talbot, and he is not 'actively resisting' (pushing, pulling, evasive arm movement, flailing, flight, muscle tension etc. to avoid control) any of the defendants located within the cell with him. His movements during that time period are consistent with a man who has been subjected to lengthy applications of OC spray directly into his eyes four times (the last two sprays 4 minutes and 2 minutes before, with no remediation) who is also suffering from anxiety brought on and exacerbated by his mental illness and his physical withdrawal from his methadone treatment.**

100. **At the 11:28 mark on the DOC handheld videotape (approximately 7:16 a.m.), Defendant Padro motions to Defendant Belanger and indicates "get the In-Cells." Defendant Belanger thereafter withdraws to the cell**

doorway and while smiling, yells down the hallway to "get In-Cells."

101. At no time prior to the giving of the order by Defendant Padro to Defendant Belanger to "get the In-Cells" was Mr. Talbot acting in any manner other than as a frightened, physically injured, blinded, mentally distressed person physically impaired by the respiratory issues, skin burning issues and tremendous fear and distress caused by the actions of the defendant corrections officers.

102. Department of Corrections Administrative Directive #6.5(2) governs the permitted use of In-Cell Restraints and only permits the use of In-Cell Restraints in limited circumstances, specifically defined as:

   2.   In-Cell Restraints:

      a.   General Provisions

         i. In-Cell Restraints may be used by custodial staff if an inmate meets any following criteria:
         1. Continual to disruption the normal operations of the facility;
         2. Exhibiting imminent self-injury actions;
         3. Jeopardizing the safety of staff or other inmates; and
         4. Poses a serious threat to the security or orderly running of the institution.

         ii. In-Cell Restraints shall not be used as punishment, as a substitute for less restrictive interventions or for convenience of the staff.

103. Defendants Belanger, Coggins, Gibbons and Daniels were all aware that in the two minutes since Mr. Talbot had been sprayed a fourth time by Defendant Padro that he was neither "actively resisting" any of the defendants, nor did his actions within the cell constitute any of the criteria listed in Administrative Directive #6.5(2) that justified the use of

In-Cell Restraints. Despite this, Defendants Belanger, Daniels, Gibbons or Coggins did not say or do anything to protect Mr. Talbot and/or require Defendant Padro or any other officer to comply with known applicable regulations of the Department of Corrections, and these defendants did not prevent Defendant Padro from applying In-Cell Restraints to Mr. Talbot for the purpose of imposing punishment on him.

104.  Defendants Belanger, Coggins, Padro and Gibbons, who were in the cell during this time period, all filed false Use of Force Reports asserting that Mr. Talbot was exhibiting "Active Resistance" at the time the decision was made to place Mr. Talbot in In-Cell restraints, though this was obviously untrue and was known to be untrue by these defendants at the time they completed their Use of Force Reports in an attempt to justify the use of In-Cell Restraints on Mr. Talbot.

105.  Subsequent to being sprayed for the fourth time at the 09:23 mark of the DOC handheld videotape until he is left in the cell on his back after being chained, Mr. Talbot is coughing as a result of the application of OC spray and the effect of that spray on his respiratory system, and he is complaining that his eyes and skin burn and that he needs to go to the bathroom.  All requests by Mr. Talbot for assistance and remediation from these conditions are refused and/or ignored by the defendants prior to, and while he is being placed in In-Cell Restraints.

106.  At the 12:41 mark on the DOC hand-held video tape (approximately 7:17 a.m.), Defendant Zukowska, arrives at Mr. Talbot's cell in the RHU. Although she was summoned to the cell, Defendant Zukowska was not

33

told to bring anything to remediate Mr. Talbot's obvious physical and emotional concerns subsequent to the repeated applications of OC spray by Defendant Padro. As a result, Mr. Talbot continued to suffer from the physical, emotional and psychological effects of the third OC spray applied the third time by Defendant Padro at 07:00 (5 minutes and 41 seconds earlier) and Padro's fourth application of OC spray at 09:22 (3 minutes and 19 seconds before) without receiving any medical remediation. Mr. Talbot is heard repeatedly coughing, and is in obvious pain and discomfort; however, he remains compliant and the defendant officers are not required to place their hands on him to control his behavior during this time period.

107. Prior to the forcible effort to place Mr. Talbot in In-Cell Restraints, each of the defendants individually should have known that Mr. Talbot's behavior was the result of his mental illness and the physical effect of his withdrawal upon being reincarcerated, each of which conditions were exacerbated immeasurably by the random, brutal, improper and repeated uses of force which all defendants witnessed. These uses of force included, in particular, Defendant Padro's kick to Mr. Talbot while lying blinded by OC spray on the floor of the shower; the repeated applications of OC spray in the shower area; in the elevator; and in the RHU cell, all of which were exercised in direct violation of the DOC policies and the specific training received by the DOC officers, including the training based upon the OC manufacturer's specific instructions and warnings of which the defendants were or should have been aware.

34

108. **At the 13:00 mark on the DOC hand-held video tape (approximately 7:18 a.m.), the In-Cell Restraints arrive at Mr. Talbot's cell. Without justification, Defendant Gibbons forcibly pushes the blinded Mr. Talbot into the cell wall and forces him onto the bunk. Next, numerous defendants begin a "pig pile" on top of Mr. Talbot in order to effectuate the implementation of In-Cell Restraints on Mr. Talbot.**

109. **Defendants Petaway, Washington, Davidson and Gatison are brought into the cell at the direction of Defendant Padro to pin down and apply significant physical force and restraint to Mr. Talbot during the implementation of the In-Cell Restraints.   Defendants Petaway and Washington joined defendants, Gibbons, Belanger, Padro and Davidson, in placing their collective weight onto Mr. Talbot, whose body was being forcibly pushed face down on his chest onto the surface of his bunk.**

110. **While Mr. Talbot was being physically chained by Defendants Gibbons, Pettway, Belanger, Washington, Davidson, Padro and Gatison, these defendants were placing their full or partial weight onto Mr. Talbot, thereby restricting his breathing while he was face down under the collective weight of these 5-6 correctional officer defendants.  At this time, each of these defendants knew that Mr. Talbot had been sprayed with OC spray and were also aware that the cell where he was confined was contaminated with OC spray, and that Mr. Talbot was unable to breathe under the collective weight of these defendants and under these dangerous circumstances.**

111. **While these actions were taking place, Defendants Padro and Coggins**

were the supervisors responsible for the actions of the other defendants who were piling upon Mr. Talbot. Defendants Padro and Coggins knew, or should have known from their training, that applying any force that would restrict the ability of Mr. Talbot to breathe after he received multiple applications of OC spray could cause him serious injury or death, particularly since no efforts at remediation had taken place since the application of OC spray many minutes earlier on two separate occasions. Defendants Padro and Coggins also knew that the cell in which Mr. Talbot was confined was contaminated with OC spray, as was Mr. Talbot's clothing. Despite this, they did nothing to minimize this risk to Mr. Talbot and proceeded to permit and encourage the application of significant pressure upon Mr. Talbot's chest while he lay face down on the bunk.

112. Defendants Padro, Coggins, Gibbons, Belanger, Petaway, Washington, Davidson and Gatison, in addition to Defendant Zukowska (who was present for much of the 'pig pile' involving the defendant correctional officers), knew or should have known from their training that applying restraint against a person who has received numerous applications of OC spray and restricting his ability to breathe could cause significant injury or death.

113. While defendants were engaging in this 'pig pile' upon Mr. Talbot, he is seen struggling to avoid the crushing weigh of the officers who are applying their weight against him, preventing him from breathing. Defendant Belanger forcibly struck Mr. Talbot in his right upper leg

36

numerous times with his knee in addition to applying his body weight on top of Mr. Talbot.

114. **At the 16:45 mark on the DOC hand-held video tape (approximately 7:21 a.m.), over 3 minutes and 45 seconds after the initiation of the forcible application of the In-Cell Restraints at 13:00, an order was given by Defendant Padro to "flip him over."  Prior to that order, Mr. Talbot had been forcibly restrained in the prone position for nearly four minutes, and had remained under the weight of these numerous defendants, on his chest, unable to breath and subjected to intense physical pressure and force for the duration of that time period.**

115. **Once "flipped over" into the supine position, the defendants completed the process of installing the In-Cell Restraints on Mr. Talbot for another 1 minute 53 seconds, a process which continued until 18:28 on the DOC hand-held video tape (approximately 7:23 a.m.). By the time the process of applying In-Cell Restraints was completed, Mr. Talbot had been subjected to the intense physical forces exerted by the defendants in the course of this 'pig pile' for a period in excess of 5 minutes and 35 seconds. During this time, Mr. Talbot was effectively unable to move, his breathing was significantly restricted by the weight of 5-6 correctional officers on top of him, and he was subjected to numerous physical blows by the defendants. He still had received no remediation from the OC spray applied at 07:00 (11 minutes, 28 seconds before) and at 09:22 (9 minutes, 6 seconds before), and was effectively blind during this 'pig pile' and suffering from all of the respiratory**

restrictions known by the defendants to be caused by numerous applications of OC spray.

116.  Defendant Zukowska is seen on the DOC handheld video tape arriving back at Mr. Talbot's cell at the 16:00 mark (approximately 7:21 a.m.). She looks into the cell and observes the 'pig pile' when Mr. Talbot is still on his chest surrounded by the numerous defendants identified above. At no time does Defendant Zukowska intervene or in any way assist Mr. Talbot despite knowing of Mr. Talbot's prior respiratory, mental health and other physical concerns, and when she knew, or should have known from her training of the significant risk of injury or death that could arise from the restriction of Mr. Talbot's ability to breathe after being sprayed with OC, particularly given his medical contraindications of which she was aware.

117.  Once Mr. Talbot is chained, Defendant Coggins stands at the door of the cell and states to each of the defendants as they leave the room "Good Job, Good Job." He further asks each of the corrections officers if they are "okay" and yet he asks no questions of Mr. Talbot to determine his physical, emotional or mental well-being.

118.  In response to Defendant Coggins' commendation that he did a "Good Job," Defendant Washington replied "light work right there, light work." This statement, like all of the actions of the defendants, exhibited an obvious indifference to the physical, emotional and psychological trauma suffered by, and continuing to be suffered by Mr. Talbot, who had still not received any required remediation from the repeated

applications of OC spray by Defendant Padro.

119.  Once he was "flipped over" onto his back, it did not appear that Mr. Talbot ever moves on his own, or responds to any verbal communications from any of the defendants. He does not cry out, and though he has not been decontaminated, he has stopped communicating the discomfort from the repeated applications of OC spray from Defendant Padro directly into his face and eyes. Clearly, he is in medical distress as a result of the treatment he has received at the hands of the defendants.

120.  At the 18:39 mark on the DOC handheld videotape (approximately 7:23 a.m.), Defendant Zukowska was at Mr. Talbot's side, and at 19:15 she stepped away from Mr. Talbot, and eventually leaves the cell at 19:25 (approximately 7:24 a.m.).  She applied a superficial amount of eye wash for several seconds to Mr. Talbot, and allegedly checks his pulses and leaves him in that state. This is the full extent of the decontamination efforts provided to Mr. Talbot by Defendant Zukowska or any other defendant.  At 19:16 on the DOC handheld videotape (approximately 7:24 a.m.), Defendant Padro states, "Alright he's fine he's been decontaminated – Are you ready to go?" -  though it is obvious that the decontamination efforts at that time failed to meet any applicable DOC regulations or the requirements of the manufacturer's instructions.

121.  At the 19:28 mark on the DOC handheld videotape, Defendant Padro leaves Mr. Talbot's cell and states, "make sure the water is turned off," and at 19:35 Defendant Coggins checks that the water is off.

122. **At the 19:43 mark on the DOC handheld videotape (approximately 7:24 a.m.), the camera is turned off and Mr. Talbot is seen on his back, wearing his orange jumpsuit saturated with OC spray, chained, his head propped back against the hard surface of the metal bunk in a cell completely contaminated by OC pepper spray. He appears entirely unresponsive.**

123. **At approximately 7:26 a.m., Defendants Zukowska and Padro are observed on a fixed camera in the hallway of the Foxtrot Unit walking back towards Mr. Talbot's cell. They enter the cell for approximately 21 seconds and leave. A mattress had previously been thrown onto the floor of Mr. Talbot's cell by a corrections officer. As Defendants Zukowska and Padro leave the cell, Mr. Talbot is left alone as the cell door is closed.**

124. **Pursuant to the Department of Corrections Regulations, each RHU prisoner placed in In-Cell Restraints must be subjected to an inspection every 15 minutes by a corrections officer during which inspection the corrections officer is required to confirm that there is "live, breathing flesh" inside of each cell unit.**

125. **Pursuant to DOC Regulations, a "Restraint Checklist" is required to be filled out by the corrections officers performing the inspections on an inmate in RHU to confirm that inspections were performed as well as to confirm the physical condition of the prisoner, and in doing so, specifically confirming that the corrections officer patrolling the unit observed "live, breathing flesh" in each cell.**

126.  **A DOC "Restraint Checklist" was created pertaining to the placement of Mr. Talbot in In-Cell Restraints beginning at 7:25 a.m. on March 21, 2019.   The Restraint Checklist produced by the Department of Corrections allegedly detailing the time inspection tours took place as well as Mr. Talbot's physical condition at the time of those inspections between 7:25 a.m. on March 21, 2019 and at 9:10 a.m. on March 21, 2019 is a falsified document.**

127.  **The defendants, individually or collectively, created or allowed to be created, a "Restraint Checklist" that did not accurately convey either the inspections undertaken that morning, or correctly reflect the observations of the corrections officers with respect to Mr. Talbot's physical condition during the time frame from 7:25 am until 9:10 am on March 21, 2019.**

128.  **The Restraint Checklist created by the DOC employee(s)is a fabrication designed to cover up the failures of the correction department's staff and these particular defendants to adequately supervise Mr. Talbot between the hours of 7:25 a.m. and 9:10 a.m. on the morning of March 21, 2019.**

129.  **The fabricated Restraint Checklist created by the DOC employee(s) indicates that a correctional officer defendant "CP" (either Defendant Carlos Padro or Defendant Caron Petaway) conducted inspections at 7:25, 7:30 and 7:45 a.m. on the morning of March 21, 2019. These inspections did not take place on that identified schedule, and further the notations that Mr. Talbot was observed "yelling and/or screaming, or**

41

talking to himself" are fabrications. Those inspections reported to have been conducted by "CP" were falsified and the video tape evidence of activity outside of Mr. Talbot's cell confirm that these entries are false.

130.  The Restraint Checklist created by the defendants, individually or collectively, for the time period between 8:00 a.m. and 8:45 a.m. has also been fabricated to cover up the failures of the correction department's staff and these particular defendants to adequately supervise Mr. Talbot between the hours of 8:00 a.m. and 9:10 a.m. on the morning of March 21, 2019.

131.  The Restraint Checklist created by the defendants, individually or collectively, for the time period between 8:00 a.m. and 8:45 a.m. indicate that Defendants Wilkes and Antoine conducted four different visits to Mr. Talbot's cell at 8:00 a.m.; 8:15 a.m., 8:30 a.m. and 8:45 a.m. That Restraint Checklist indicates that between 8:00 a.m. and 8:45 a.m. Mr. Talbot was observed lying or sitting, and was quiet, or was talking to himself.  These Restraint Checklist entries and the information contained therein with regard to the timing of these inspections and the observations of the defendant corrections officers are fabrications and are false.

132.  Based upon a review of the video tape from fixed cameras outside of Mr. Talbot's cell, it is apparent that at approximately 8:14 a.m. one corrections officer, believed to be Defendant Wilkes, looks in Mr. Talbot's cell at approximately 8:14 a.m. for numerous seconds.

133.  At 8:24 a.m., a corrections officer believed to be the Defendant, Petaway, looks towards Mr. Talbot's cell room door window for approximately one second, but does not appear to observe that location

for the amount of time necessary to determine whether there was "live, breathing flesh" in Mr. Talbot's cell.

134.   At approximately 8:30 a.m., a corrections officer believed to be Defendant Antoine, looks for approximately one second at the window of Mr. Talbot's cell, but does not appear to observe that location for the amount of time necessary to determine whether there was "live, breathing flesh" in Mr. Talbot's cell.

135.   At approximately 8:48 a.m., a corrections officer believed to be Defendant Wilkes, looks at the window of Mr. Talbot's cell for less than one second, but does not appear to observe that location for the amount of time necessary to determine whether there was "live, breathing flesh" in Mr. Talbot's cell.

136.   At approximately 8:57 a.m., a corrections officer believed to be Defendant Antoine, looks in the window of Mr. Talbot's cell for approximately one second, but does not appear to observe that location for the amount of time necessary to determine whether there was "live, breathing flesh" in Mr. Talbot's cell.

137.   Defendants Antoine, Petaway and Wilkes failed to comply with DOC standards regarding the inspection of prisoners placed into In-Cell Restraints and failed to ascertain whether Mr. Talbot was alive and breathing during their rounds. In failing to do so, Defendants Antoine, Petaway and Wilkes acted with deliberate indifference to his serious medical needs and exposed him to an unsafe condition that posed an unreasonable risk of serious harm to his future health.

43

138. **During the time that the Defendants Petaway, Antoine, and Wilkes were responsible for ascertaining that Mr. Talbot was 'alive and breathing,' he was in fact suffering and dying, and had ceased movement, ceased breathing and ceased to be alive. The deliberate indifference shown by these defendants to his medical needs prevented any medical assistance from being rendered in a timely fashion to Mr. Talbot, resulting in his death.**

139. **Approximately 1 minute and 30 seconds after Defendant Antoine walked past the window of Mr. Talbot's cell at approximately 8:57 a.m., Lt. Angel Champion entered the cell and discovered that Mr. Talbot was not breathing and was essentially lifeless.   She then summoned emergency help and a hand-held video tape operated by a member of the corrections staff begins taping the futile effort to revive Mr. Talbot.**

140. **Mr. Talbot was never revived and he was pronounced dead at Yale New Haven Hospital at 9:34 a.m. In fact, Mr. Talbot had likely died in the cell shortly after being left there by Defendants Padro, Zukowska, Coggins, Belanger, Davidson, Gatison, Washington, Gibbons and Petaway.**

141. **At the time personnel from AMR ambulance arrived at 9:06 a.m., Mr. Talbot was described as "pulseless and apneic…patient's face was cold and blue…patient's jaw was stiff and tongue was swollen." Mr. Talbot had been dead for a significant amount of time, and clearly had been dead during the time that Defendants Petaway, Wilkes and/or Antoine purported to conduct 'inspections' of him and documented his status as**

44

'lying or sitting, quiet and talking to himself.'

142.  When rescue personnel, including members of the New Haven Fire Department and the AMR Ambulance Corps arrived at Mr. Talbot's cell at approximately 9:04 a.m., notations were made in the New Haven Fire Department's report that "patient was heavily pepper sprayed upon arrival", and "my partner and I took over CPR and the BVM from nursing correction staff. While attending to the patient, my partner and I started coughing and sneezing from potential pepper spray being sprayed before we arrived."

143.  The cell in which Mr. Talbot was confined from 7:25 a.m. until he was discovered at approximately 9:00 a.m. remained heavily contaminated with OC spray, as was the clothing he was wearing.

144.  Shockingly, and in total disregard for his life, defendants did not remove Mr. Talbot from the contaminated environment of his cell and provide to him the necessary and required level of decontamination required by DOC regulations as well as the specific instructions from the manufacturer of the OC spray used on Mr. Talbot. Defendants knew or should have known from their training that to leave Mr. Talbot in this cell, which was contaminated with OC spray, wearing his clothing that had been saturated in OC spray, in a restrained position on his back, without any effective application of water to alleviate the effect of OC on his eyes, skin and respiratory system was to act in a manner that was in wanton disregard for Mr. Talbot's life. To have done so after subjecting Mr. Talbot to the extreme physical torment of having 5-6 defendants

45

restrict his breathing for over four minutes while they applied the In-Cell Restraints, despite Mr. Talbot having been inundated with OC spray, was further evidence of this wanton disregard for Mr. Talbot's life.

145.     An autopsy was conducted by the State of Connecticut Office of the Chief Medical Examiner on March 22, 2019.  The "Cause of Death" was identified by the Chief Medical Examiner as the following:

SUDDEN DEATH DUE TO PHYSICAL STRUGGLE WITH RESTRAINT, ATHEROSCLEROTIC AND HYPERTENSIVE CARDIOVASCULAR DISEASE AND MORBID OBESITY.

The "Manner of Death" found by the Medical Examiner was stated as:

HOMICIDE (STRUGGLE/RESTRAINT INVOLVING CORRECTIONS PERSONNEL)

## CAUSES OF ACTION

**Count I – Eighth Amendment Excessive Force Claim/14th Amendment Substantive Due Process/42 U.S.C. Sec 1983   Claim – Against Defendants Padro, Coggins, Belanger, Gibbons, Daniels, Brookshire, Petaway, Washington, Gatison, Davidson**

146.   **Defendant correction officers Padro, Coggins, Belanger, Gibbons, Daniels, Brookshire, Petaway, Washington, Gatison and Davidson maliciously engaged in excessive force against Mr. Talbot that was in gross excess of any security need. The use of OC spray by Defendant Padro and the alleged use of OC Spray by Defendant Brookshire were in violation of DOC regulations; was objectively unreasonable; as was the lack of efforts by the defendants to comply with DOC regulations and manufacturer's instructions regarding decontamination, which resulted in the continued unreasonable use of force as the continuing effect of the OC spray on Mr. Talbot remained unabated; as was the application**

of a kick to Mr. Talbot's upper torso/head by Defendant Padro; as was the implementation of In-Cell Restraints by Defendant Padro for no justifiable administrative purpose and in violation of DOC standards for the use of In-Cell Restraints; as was the use of force by Defendants Belanger, Gibbons, Petaway, Daniels, Washington, Gatison and Davidson during their efforts to apply significant physical force and weight upon Mr. Talbot during the 'pig pile' in which each defendant individually and collectively applied significant force to Mr. Talbot's body despite knowing that he had been sprayed repeatedly with OC spray, and thereby preventing him from breathing; as was the failure by all these defendants to comply with their training as Correctional Officers to avoid the unnecessary and objectively unreasonable use of force against Mr. Talbot, which resulted ultimately in his death.

147.  The excessive use of force against Mr. Talbot violated his Eighth Amendment and/or 14th Amendment rights the U.S. Constitution.

**Count II – Eighth Amendment Medical Care Claim/14th Amendment Substantive Due Process/42 U.S.C. Sec 1983 Claim – Against Correctional Officer Defendants (Padro, Coggins, Belanger, Gibbons, Daniels, Petaway, Washington, Gatison, Davidson) Medical Staff (Zukowska); Hallway Inspection CO's (Petaway, Wilkes, Antoine)**

148.  During the time period in which Mr. Talbot was subjected to the force described above, the conditions he was subjected to were ones that were known to the defendants as ones that may produce death, degeneration, or extreme pain. As a result, the defendants were aware of a substantial risk that Mr. Talbot would suffer serious harm as a result

of their actions or inactions.

149. **Defendants Padro, Coggins, Belanger, Gibbons, Daniels, Petaway, Washington, Gatison, and Davidson were deliberately indifferent to Mr. Talbot's need for medical care when they refused to provide him with immediate decontamination care required for an individual who had been repeatedly sprayed with OC spray, including removing him from his contaminated cell, removing his contaminated clothing, placing him upright to allow him to breathe, calling for medical care such as EMS or a physician; or responding to his obvious mental and physical needs after he was subdued and restrained by the collective weight of 5-6 defendants for numerous minutes, thereby restricting his ability to breathe; and by leaving him unattended, without medical care, in his cell after knowing that he was likely in significant medical distress.**

150. **Defendant Zukowska was deliberately indifferent to Mr. Talbot's need for medical care when, despite having personal knowledge of Mr. Talbot's prior medical history that contraindicated the use of OC spray, she refused or failed to ensure that prior to the planned use of OC spray by Defendants Brookshire and/or Padro she properly evaluated Mr. Talbot, as required, to determine whether use of OC spray upon him was contraindicated by his medical record; when she refused or failed to ensure that Mr. Talbot was properly decontaminated after he was sprayed in the Medical Unit by Defendants Padro and/or Brookshire; when she witnessed Mr. Talbot being restrained and prevented from breathing by the collective weight of 5-6 defendants after being**

repeatedly sprayed with OC spray but failed and refused to either prevent the application of such restraining force upon his ability to breathe or address this issue medically upon the cessation of the force used against Mr. Talbot; by refusing and failing to remove Mr. Talbot from the contaminated cell; by refusing and failing to decontaminate Mr. Talbot appropriately by removing him from the contaminated cell, removing his clothing, providing him fresh air to breathe, appropriately providing eye and skin wash to alleviate his pain; by failing and refusing to place him in an upright position rather than allowing him to remain chained on his back on a metal bunk in a contaminated cell; by refusing and failing ascertain his medical condition based upon what she had directly observed and she knew from her personal knowledge of Mr. Talbot's prior medical history; and by refusing or failing to provide him with emergency care to alleviate the precarious medical situation Mr. Talbot was in when he was left in his cell, was barely responsive and was clearly in medical distress.

151. Defendants Wilkes, Petaway and Antoine were deliberately indifferent to Mr. Talbot's need for medical care when, after he was placed on his back, chained, in the Restricted Housing Unit cell, they failed to ascertain whether he was 'alive and breathing' and instead failed and refused to conduct a meaningful medical check to determine whether Mr. Talbot required medical assistance. Through their deliberate indifference these defendants refused and failed to ascertain whether Mr. Talbot was in fact 'live, breathing flesh' during the course of their

rounds even though Mr. Talbot clearly suffered a medical event and was in need of immediate, emergency medical care.

152.  **These failures to provide Mr. Talbot with adequate medical care that ultimately led to his death violated his Eighth Amendment and/or 14th Amendment rights under the U.S. Constitution.**

**Count III – Eighth Amendment/14th Amendment/42 U.S.C. Sec 1983 Failure to Intervene – Against defendant Coggins.**

153.  **Defendant Coggins was in the presence of Defendant Lt. Padro at the time he applied OC spray twice to the face of Mr. Talbot in the shower. Defendant Coggins was also in the presence of Defendant Padro when he applied the kick to Mr. Talbot's head/upper torso. Prior to the application of OC spray to Mr. Talbot's face on these two occasions, Defendant Coggins was aware that Defendant Padro was intending to apply OC spray despite not having inquired whether there were medical contraindications present in Mr. Talbot's medical file, which was available to Defendant Coggins by asking Defendant Zukowska, who was also present and had access to Mr. Talbot's medical file.**

154.  **Defendant Coggins was in the presence of Defendant Padro when he applied OC spray a third time in the elevator doorway on the way to the RHU. Defendant Coggins was also in the cell when Defendant Padro sprayed Mr. Talbot a fourth time with OC spray in the cell. On both these occasions, Defendant Padro displayed his OC spray in his hand in clear view of Defendant Coggins prior to applying the OC spray to Mr. Talbot's face.**

155. **Defendant Coggins was in the cell and observed the behavior of Mr. Talbot in the minutes preceding Defendant Padro's order to 'get the In-Cells." Defendant Coggins knew at that time that Mr. Talbot's actions directly preceding the order to implement In-Cell Restraints did not justify the implementation of In-Cell Restraints pursuant to DOC Administrative Regulation 6.5(2), but failed and neglected to prevent the harm that came to Mr. Talbot through the implementation of that order.**

156. **Defendant Coggins was aware that Mr. Talbot was subjected to the significant force of numerous correctional officers that applied their body weights upon him as he was face down on the metal bunk in the cell while being restrained. Defendant Coggins was trained in the use of OC spray and was aware that a person who has been repeatedly sprayed with OC spray should not have his ability to breath compromised in any way; that a person who has been sprayed with OC should be seated upright, not left on his back; that a person who has been sprayed with OC should be removed from the contaminated area and his clothing should be removed; and that a person that has been sprayed repeatedly with OC spray requires a thorough decontamination process.**

157. **Despite having a realistic opportunity to intervene to prevent the harm to Mr. Talbot, and based on his training and experience it was reasonable for a person in Defendant Coggins' position to know and understand that the constitutional rights of Mr. Talbot were being violated, Defendant Coggins took no reasonable steps to intervene and**

51

prevent these actions from taking place.

**Count IV – Assault and Battery – Against Defendants Padro, Belanger, Gibbons, Washington, Davidson, Gatison, Petaway**

158.   Defendant Padro committed an assault and battery upon Mr. Talbot when, without warning, he applied OC spray twice to Mr. Talbot's face while Mr. Talbot was on his back, completely defenseless, in the shower in the Medical Unit.

159.   Defendant Padro committed an assault and battery upon Mr. Talbot when, without warning, he forcibly and intentionally kicked Mr. Talbot in his face/upper torso area while Mr. Talbot was on his back, completely defenseless, in the shower in the Medical Unit.

160.   Defendants Padro, Belanger, Gibbons, Washington, Davidson, Gatison and Petaway committed an assault and battery upon Mr. Talbot when, in the RHU cell, they forcibly restrained him face down on a metal bunk, applied significant and constant pressure upon his back and body, kicked and/or punched him, and restricted his ability to breathe, all while Mr. Talbot was effectively blinded by repeated applications of OC spray.

**Count V – Intentional infliction of Emotional Distress – Against Defendant Padro**

161.   Defendant Padro intentionally sprayed Mr. Talbot the first time in the shower without providing any warning of his intention to do so, and did so from a distance that was so close that it maximized the pain and discomfort that Mr. Padro would feel from the application of the SABRE RED OC spray. At the time Defendant Padro applied this OC

spray, Mr. Talbot was defenseless, on the floor of an enclosed shower, on his back, suffering from a mental illness breakdown in addition to going through a withdrawal from his drug use;

162. Defendant Padro then forcibly kicked Mr. Talbot in his head/upper torso area while Mr. Talbot was effectively blinded by the application of OC spray to his eyes. Again, Mr. Talbot was at the time of this kick completely defenseless, on his back, suffering from a mental illness breakdown and drug withdrawal, and was unable to breathe or see, and was obviously terrified at what was happening to him.

163. Defendant Padro then, without warning, applied a second round of OC spray directly to Mr. Talbot's eyes from a distance intended to maximize the pain and discomfort suffered by Mr. Talbot. Again, Mr. Talbot was at the time of this second application of OC spray, completely defenseless, on his back, suffering from a mental illness breakdown and drug withdrawal, and was unable to breathe or see, and was obviously terrified at what was happening to him.

164. Defendant Padro then determined that Mr. Talbot, though he was on a "Custody Hold" in the Medical Unit until his mental illness could be evaluated by a physician later that morning, would be transferred to the Restricted Housing Unit and proceeded to bring him up to the RHU.

165. Despite Mr. Talbot exclaiming that his eyes and skin were burning, and despite him being in obvious physical and emotional pain and

distress, Defendant Padro reacted to Mr. Talbot's distress by once again, without warning and for the third time, applying OC spray directly into his eyes and face from a distance intended to maximize the pain and discomfort suffered by Mr. Talbot.

166.   Defendant Padro then had Mr. Talbot placed within a cell and, though Mr. Talbot cried out "Where am I" and that he was "on fire," Defendant Padro ordered two other officers to pin Mr. Talbot to the bunk wall and insisted, despite him being in obvious pain, that Mr. Talbot 'calm down.' Rather than wait for medical personnel to arrive to alleviate the burning of his eyes and skin, and to allow him to breathe, Defendant Padro chose to, without warning and for the fourth time, apply OC spray directly into Mr. Talbot's eyes and face from a distance intended to maximize the pain and discomfort suffered by Mr. Talbot.

167.   Now blinded completely by two consecutive blasts of OC spray that had not been decontaminated, Mr. Talbot is scared, surrounded by correctional officers he cannot see, and is desperately trying to breathe and obtain some kind of relief from the burning in his eyes and on his skin. The air in the cell he is in is contaminated with OC spray, as is the clothing he is wearing. Despite this, he neither touches a correctional officer nor does a correctional officer need to place a hand on him to control his behavior. He is effectively a scared, blinded man, under significant mental distress, unable to breathe, defend himself, or obtain relief from the effects of the OC sprayed twice into his eyes and face.

168. **Defendant Padro then ordered that Mr. Talbot be forcibly placed into 'In-Cell Restraints." For the next eight minutes Mr. Talbot will receive no decontamination, and on Defendant Padro's orders, he will be forcibly pushed against a cell wall, his face and chest forced onto a metal bunk, while 5-6 correctional officers press their body weight against his back, restricting his ability to breathe. Defendant Padro will allow all of this to occur despite being trained that applying force or restraint against a person who has been sprayed with OC spray can cause significant injury or death.**

169. **Defendant Padro continued to pursue this course of outrageous, barbaric, cruel conduct towards Mr. Talbot even beyond the point when Mr. Talbot has stopped crying out that his skin burns, or he can't breathe; he continued to apply the chains despite Mr. Talbot becoming completely immobile and almost completely unresponsive.**

170. **When finally, the chains are applied, Defendant Padro orders in the nurse, who applies a superficial amount of eye wash to a nearly unresponsive Mr. Talbot. Defendant Padro then declares 'He's decontaminated,' though Defendant Padro knows that the entire cell, and all of Mr. Talbot's clothing are fully contaminated with OC spray. Though Defendant Padro knew from his training that Mr. Talbot should be removed from the cell and decontaminated, that his clothing should be removed and he should not be left on his back in a restrained position, Defendant Padro orders everyone to leave Mr. Talbot alone in the cell. To further prevent Mr. Talbot from being able to avail himself**

55

of any water to relieve his burning eyes and skin, Defendant Padro orders that the water to Mr. Talbot's cell is turned off.

171.   Mr. Talbot, suffering from a mental illness, and the physical effects of withdrawal, was terrified and physically traumatized by the unannounced blast of OC spray in the shower. He was then, defenseless and blinded, kicked by Defendant Padro in his head/upper torso, causing extreme pain that made him cry out. Almost instantly, he was thereafter sprayed again in his eyes and face causing him to be unable to breathe or see and causing a terrible burning sensation to his skin. Scared and being taken away from the Medical Unit where he was to be treated for his mental illness, he is sprayed again, directly into his face, again without warning, in the elevator, causing him additional pain and fear. Still blinded, he is sprayed again in the RHU cell, where his is heard crying out for help to relieve his burning skin and where he is unable to breathe in the contaminated air of his cell. He is then set upon by correctional guards he likely cannot see, forced onto his stomach where he is filled with terror and distress because he cannot breathe under the weight of these officers and where he is suffering from the constricting effect of the OC spray on his respiratory system. He ceases to move or cry out under the pile of officers, and when he is left chained on his back, he is immobile and unresponsive. His level of physical and emotional distress at that point is unbearable. He will very shortly be dead.

172.   It is clear that Defendant Padro intended to inflict emotional distress

upon Mr. Talbot or that he knew or should have known that the emotional distress was a likely result of his conduct.

173.  **Defendant Padro's conduct was extreme and outrageous.**

174.  **Defendant Padro's conduct was the cause of the Mr. Talbot's distress.**

175.  **The distress suffered by the Mr. Talbot was severe.**

## PRAYER FOR RELIEF

**WHEREFORE, Plaintiffs request that the Court grant the following relief:**

A.  **Award compensatory damages;**

B.  **Award punitive damages against defendants;**

C.  **Grant attorneys' fees and costs;**

D.  **Such other relief as the Court deems just and proper.**

**THE PLAINTIFF**

**BY:   /s/   Arthur C. Laske, III**
**Arthur C. Laske, III, Esq.**
**Laske Law Firm, LLC**
**1 Eliot Place, 3rd Floor**
**Fairfield, CT 06824**
**Phone: (203) 254-1770**
**Fax: (203) 256-9442**
**Email:  acl@laskelaw.com**
**Juris No. ct03773**

**CERTIFICATION**
**I hereby certify that on June 9, 2022 a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing. Parties may access this filing through the Court's system.**

**  /s/ Arthur C. Laske, III, Esq.**
**Arthur C. Laske, III, Esq.**

58