# EXHIBIT H

```
 1              UNITED STATES DISTRICT COURT

 2                 DISTRICT OF CONNECTICUT

 3

 4   - - - - - - - - - - - - - x
                                :
 5   COLLEEN LORD, ET AL,       :
                                :
 6      Plaintiffs              :
                                : CIVIL NO:
 7             VS               : 3:22-cv-0322(VLB)
                                :
 8   CARLOS PADRO, ET AL,       : April 21, 2023
                                :
 9      Defendants              :
                                :
10   - - - - - - - - - - - - - x

11

12                       VIDEOTAPED

13

14           Deposition of MARCO ANTONIO PEREZ

15   JUAN PADRO, JR., taken pursuant to the Federal

16   Rules of Civil Procedure at the Laske Law

17   Firm, LLC, 1248 Post Road, 2nd Floor,

18   Fairfield, Connecticut on Friday,

19   April 21, 2023 at 11:00 a.m. before LOUISE E.

20   BOUTEILLER, CSR, a Connecticut Shorthand

21   Reporter and a Notary Public in the State of

22   Connecticut.

23

24

25
```

```
 1   kicked Mr. Talbot, the act for which he'd been
 2   arrested?
 3       A    He would have been arrested based on the
 4   act of -- he would have been violated based on
 5   his -- based on the arrest, yes.
 6       Q    Did you make a determination that the
 7   kick violated Administrative Directives?
 8       A    I don't recall if I had that -- say that
 9   one more time.
10       Q    Did you make a determination at the time
11   you wrote this report that one of the actions upon
12   which Lieutenant Padro would have been culpable
13   would have been the kick delivered to Mr. Talbot in
14   the shower?
15       A    I did not.
16       Q    So you made no conclusions as to whether
17   the kick violated 6.5 as of the time you
18   investigated this matter?
19       A    I would have to interview him and
20   inquire about the kick.
21            I don't know -- the kick isn't on
22   camera, so I just can't look at the video and just
23   say this is what I think is happening.  This is
24   what I believe is happening without the ability to
25   interview Lieutenant Padro.  I could not violate
```

```
 1    him on something that is not on camera.  I would
 2    need to be able to interview him and inquire, you
 3    know, did this occur.
 4              From my recollection -- best
 5    recollection there is -- I don't see it on the
 6    camera; therefore, I can't violate him.  I don't
 7    know what was occurring back there; never had a
 8    chance to interview him.
 9       Q    Okay.  So is it fair for me to assume,
10    then, that when you made the statement based on
11    your evidence pursuance to this investigation, this
12    investigator concluded that had Lieutenant Padro
13    not retired from State service, he would have been
14    culpable of violating Administrative Directive 6.5
15    Use of Force, you would not include the kick issued
16    by Lieutenant Padro against Mr. Talbot as part of
17    your conclusions regarding a violation of 6.5 Use
18    of Force?
19              MR. YALE:  Objection to form.
20              THE WITNESS:  You're asking me if
21         I would violate an employee for kicking
22         an inmate, correct, or are you asking
23         would I violate Lieutenant Padro for
24         what I believe occurred off camera
25         without being able to interview him?  Is
```

```
 1            that where you hit or strike him for a
 2            kick?
 3   BY MR. LASKE:
 4       Q    I'll make it simple.
 5       A    Please.
 6       Q    When you said Lieutenant Padro would
 7   have been culpable and would have been written up
 8   for a violation of 6.5 at the time you wrote this
 9   report, you would not have written him up for the
10   kick?
11                 MR. YALE:  Objection to the form.
12                 THE WITNESS:  The kick is not on
13            camera.
14                 I would have to interview him and
15            ask did you kick him.
16                 No one witnessed the kick, so I
17            would have to interview him and inquire,
18            did you kick the guy.
19                 I don't know what occurred back
20            there.  I don't know if the inmate hit
21            his leg without the ability to interview
22            him.
23   BY MR. LASKE:
24       Q    Okay.  So you had made no conclusions as
25   to whether Lieutenant Padro would have been
```

```
 1   culpable for kicking Mr. Talbot at the time you
 2   wrote this report?
 3        A    I don't make any conclusions on any
 4   violation for Mr. Padro, who had retired from State
 5   service.
 6        Q    But the problem I have with that, sir,
 7   is that you do say here that based on 6.5, you
 8   would have concluded that he violated a policy and
 9   been culpable for it.
10        A    Yes.
11        Q    Okay.  So there is some policy that you
12   did make an affirmative conclusion on that
13   Lieutenant Padro would have been culpable of
14   violating an administrative procedure, correct?
15        A    Yes.
16        Q    But not the kick?
17        A    I would have to interview him based
18   on -- based -- the kick isn't clear on camera.
19        Q    Okay.
20        A    On camera, it's clear that Lieutenant
21   did not decontaminate the inmate.  That is a clear
22   violation.
23        Q    Okay.
24        A    I cannot violate him for something that
25   is not -- that I have no evidence.  If I cannot
```

```
 1   BY MR. LASKE:
 2        Q    And I'm not trying to harass you, sir,
 3   but I'm just trying to understand because I have a
 4   very clear statement and I'm getting somewhat
 5   unclear answers.  Maybe they're clear, but I'm just
 6   not understanding them.  So I'll be patient with
 7   you; we'll work through this.
 8             Did you conclude when you wrote this
 9   report that Lieutenant Padro would have been
10   culpable of failing to comply with the
11   Administrative Directives on decontamination?
12        A    Yes.
13        Q    Okay.  And just to be clear, is there
14   any other portion of 6.5 that you determined
15   Lieutenant Padro would have been culpable for other
16   than decontamination at the time you wrote this
17   report?
18        A    At the time of the report, I do not
19   recall what other violations.
20             I would not have gone through a
21   directive looking for a violation to violate
22   someone --
23        Q    Okay.
24        A    -- who was no longer employed by the
25   State.
```

```
 1   question that way because I thought you had said
 2   several times that that's what you thought at the
 3   time.
 4        A    It was obvious at the time; however, I
 5   don't have a list of the --
 6        Q    So what I'm interested in is was it
 7   obvious to you at the time you wrote this report,
 8   Page 9 that we just talked about, that one of the
 9   specific provisions of 6.5 that you would have --
10   had already concluded Lieutenant Padro would have
11   been culpable of was decontamination?
12        A    I would have violated him for not
13   decontaminating the inmate.
14        Q    It was obvious to you at the time that
15   you wrote that report that that did not happen?
16        A    Yes.
17        Q    Okay.  So what was it about the actions
18   that you observed taking place on the handheld
19   videotape -- is that where you saw the action?
20        A    Yes.
21        Q    What was it about the actions that you
22   observed that took place on the handheld videotape
23   that would have concluded in your mind it was
24   obvious that there was a violation of subsection D
25   here?
```

```
 1      A    It's what's not on video.  It's not
 2   decontaminating the inmate.
 3      Q    Okay.  So we'll look at the video in a
 4   moment, but I just want to -- you looked at the
 5   video fairly recently?
 6      A    Yes.
 7      Q    Okay.  And what was it about what
 8   happened to Mr. Talbot that you believed to be
 9   clear at the time you wrote the report had -- had
10   resulted from a violation of -- or, I'm sorry.
11           What do you remember from the tape
12   established that subsection D had been violated?
13      A    There was no documentation or on video
14   of a decontamination.
15      Q    Okay.  And by that, you mean -- so
16   decontamination of any exposed person.  In this
17   case that's Mr. Talbot, right?
18      A    Yes.
19      Q    And the contaminated area.  In this
20   case, that's the cell?
21      A    Yes, I --
22      Q    Yes.  Yes, those are questions, but I
23   didn't -- okay.
24           So decontamination of any -- of any
25   exposed person, Mr. Talbot, and the contaminated
```

```
 1   area, the cell, shall be accomplished.  By "shall,"
 2   that's a mandatory, right?
 3        A    Yes.
 4        Q    Shall be accomplished as soon as
 5   practical and consistent with the safe and secure
 6   operation of the facility upon restoration of
 7   control of the incident.
 8             So in this case, when Mr. Talbot was in
 9   the cell in 5-point restraints on his back, at that
10   point was control of the incident restored?
11        A    When he was in in-cell restraints was
12   the incident controlled?
13        Q    Was control of the incident restored by
14   Correctional authorities?
15        A    I wouldn't -- I would assume so;
16   however, not being on scene I wouldn't be able --
17        Q    Okay.
18        A    I don't have the information that --
19        Q    We have the tape --
20             MR. YALE:  He's still answering.
21             MR. LASKE:  Oh, I'm sorry.
22   BY MR. LASKE:
23        Q    Go ahead.
24        A    I don't know what the information that
25   the Lieutenant had at the time; but based on what
```

```
 1      A     No.
 2      Q     Okay.  (As read):  "If a shower is not
 3   available or practical due to location of the
 4   showers or posing a risk to safety and security,
 5   the supervisor on scene shall, at a minimum, ensure
 6   that the inmate exposed to chemical agent is to be
 7   removed from the affected arrest and brought to a
 8   medical screening room for evaluation and treatment
 9   by medical staff."
10            Did I read that correctly?
11      A     Yes.
12      Q     Okay.  So with regard to your evaluation
13   of the facts of this case, was that provision of
14   the decontamination Administrative Directive
15   violated in this instance?
16      A     Yes.
17      Q     Okay.  How so?
18      A     Well, he did not move the inmate from
19   the affected area.
20      Q     Okay.  And -- and so the failure of a
21   supervisor on scene to remove Mr. Talbot from the
22   contaminated cell after he had been sprayed
23   repeatedly is a violation of this provision?
24      A     Yes.
25      Q     And you would have, under 6.5,
```

1  articulated a charge of the violation of that
2  provision against the supervisor on scene?
3     A    Yes.
4     Q    There was under iii, Change of Clothing.
5  What was your conclusion with regard to violation
6  of the decontamination provision with regard to the
7  failure to have Mr. Talbot's clothing changed?
8     A    Lieutenant Padro retired from the State
9  service, so there was no conclusion; however, at
10 the time of the investigation it was obvious he did
11 not change the inmate's clothing and, therefore,
12 would have been violated for that.
13    Q    Okay. The fourth provision is medical
14 attention.
15    A    Yes.
16    Q    Now, it's mentioned twice in this; once
17 because you've got to remove the person from the
18 room and bring them to medical screening room for
19 evaluation and treatment by medical staff, correct?
20    A    Yes.
21    Q    That was not done under Section 1,
22 correct?
23    A    Yes.
24    Q    Okay. So with regard to the violation
25 under 1, it wouldn't simply have been that the

```
 1    BY MR. LASKE:
 2         Q    Sir, did you find that in your
 3    investigation that, in your view with regard to the
 4    applicable Administrative Directives, that
 5    Lieutenant Padro violated any aspect of
 6    Administrative Directives regarding his use of OC
 7    spray in any way?
 8         A    I can't form a conclusion on that
 9    without reviewing the video incident reports and
10    interviewing Lieutenant Padro due to the fact that
11    I would not have the information that he had --
12    that he had during the deployment of chemical
13    agent.
14              He may have information that would be
15    critical in assisting in determining whether or not
16    his use of chemical agent violated policy.
17         Q    So just like -- same thing with the
18    kick, you would need more --
19         A    Well, the kick's off camera; but, you
20    know, he may have additional -- he would have
21    different information because he was on scene where
22    I can say why did deploy chemical agent at that
23    time.  Why, you know -- and he -- he would have the
24    reason behind that.  I don't -- I don't want to sit
25    here and -- and -- I don't think I would be
```

```
 1   qualified to say that's wrong and that's wrong
 2   without having the information that he had at the
 3   time and without me actually being there.
 4        Q    So just to confirm, at the time you
 5   wrote the opinion, the decision that we have here,
 6   the report, you did not make a conclusion one way
 7   or the other with regard to Lieutenant Padro's
 8   compliance with Administrative Directives regarding
 9   his use of OC?
10        A    I believe he would have been culpable
11   for the use of force policy saying specifically the
12   deployment of chemical agent without having -- you
13   reviewing all the information and being able to
14   interview him and possess the information he had at
15   the time of the incident, I wouldn't be able just
16   to Monday-morning quarterback or just look at a
17   video and say I think that's wrong, because I don't
18   have the information he had or why he may have
19   deployed chemical agent or why --
20                MR. YALE:  I think you're reading
21           into the question.
22                If I understand it, I think he's
23           asking you when you made the report --
24           well, he's asking you to confirm when
25           you made the report you did not make a
```

1    medical staff came and decontaminated him.
2         A    Yes, and then I corrected it and then
3    flushing of the eyes because that's all medical can
4    do.  Medical isn't -- they're not even responsible
5    for the clothing.  They're just for that portion of
6    it and if there's any medical attention, so
7    basically 1 and 4.  If there's medical attention;
8    for example, if an inmate's involved in physical
9    altercation, chemical agent's used, they will come,
10   flush the eyes, offer any medical attention.
11        Q    So Mr. Talbot had not been
12   decontaminated at the scene under the definition of
13   these regulations?
14        A    No.
15        Q    Okay.  And no supervisor ensured to make
16   sure that he was decontaminated, correct?
17        A    Correct.
18        Q    Okay.  And no correction officer who was
19   involved in the matter did anything to ensure that
20   Mr. Talbot be decontaminated under these
21   regulations?
22        A    Correct.
23        Q    Okay.  Each of the officers that you
24   interviewed who were involved in this matter were
25   all OC certified, correct?

```
 1              If a CO has been trained to act in a
 2   certain way, to perform his duties in a certain way
 3   through his training consistent with the
 4   regulations, and you find that they didn't act in
 5   the manner consistent with their training and the
 6   regulations upon which that training is based, can
 7   you charge them?
 8        A    Yes.
 9        Q    Okay.  Did you charge any of the COs in
10   this case?
11        A    No.
12        Q    Did you charge any of the supervisors in
13   this case?
14        A    No.
15        Q    Why not?
16        A    The supervisor on scene in charge of the
17   incident retired from State service.
18        Q    Did you charge any supervisor on scene
19   with any violations of policy?
20        A    No.
21        Q    How many supervisors were on scene?
22        A    For the -- for the use of chemical
23   agent?
24        Q    From the beginning of the shower
25   incident until Mr. Talbot was locked alone in his
```

```
 1   cell --
 2       A    Two.
 3       Q    Who were they?
 4       A    Lieutenant Coggins and Lieutenant Padro.
 5       Q    Okay.  And you reviewed the tape?
 6       A    Yes.
 7       Q    And Lieutenant Coggins was there from
 8   the shower all the way through the time they shut
 9   the door?
10       A    Yes, yup.
11       Q    And he's a supervisor?
12       A    Yes.
13       Q    Is this provision binding on Lieutenant
14   Coggins?
15       A    Yes.
16       Q    Is this provision binding on every one
17   of the COs who were present?
18       A    Do they have to follow this policy are
19   you asking?
20       Q    Yes.
21       A    Yes.
22       Q    Okay.  So if they see a violation of
23   this policy or they're asked to participate in
24   violations of this policy, they have an obligation
25   to either not do it or to say something, right?
```

```
 1      A    Yes.
 2      Q    Did you charge any of the COs in this
 3   case with not saying something about Mr. Talbot
 4   being left in the cell in a -- in a
 5   non-decontaminated state?
 6      A    No.
 7      Q    What did they do?  And by that, I mean
 8   Lieutenant Coggins or the other COs, with regard to
 9   the violation of this policy that is different from
10   Lieutenant Padro?
11      A    He was the supervisor in charge of the
12   incident and he did not decontaminate the inmate
13   that he utilized chemical agent on.
14      Q    Okay.  Is that -- does that duty only go
15   to the supervisor who is determined to be in charge
16   of the scene?
17      A    In hindsight, Lieutenant Coggins could
18   have probably been violated as well.
19      Q    For the same thing that you would have
20   violated Lieutenant Padro for?
21      A    For -- I don't know because I -- I
22   haven't -- I don't know what I would violate
23   Lieutenant Padro for, but I would -- probably now
24   with the information I possess would violate
25   Lieutenant Coggins as well.
```